IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL K.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 2944 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, 1381a, 1382c, over three years ago in August of 2017, and again in November of 2017. (Administrative Record (R.) 265-68). He initially claimed that he has been disabled since November 2014. But he apparently continued working, and later he claimed his onset date was August 2017. (R. 265, 302). Then, when it became clear that he continued to work after that, he changed the date again, to January 2018. (R. 80-81). Plaintiff claims he is disabled as a result of depressive disorder, anxiety disorder, panic disorder, insomnia, fatigue, obesity, high blood pressure, and high cholesterol. (R. 265, 302). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

under 42 U.S.C. § 405(g) on May 18, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on May 29, 2020. [Dkt. #8]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### ARGUMENT

### I.

### A.

Plaintiff was born on January 9, 1983, and so he was just 34 years old at the time he claims he became unable to work. He has a high school education. (R. 303). Plaintiff has a good work record, working steadily for the same employer from 2001 through 2017. (R. 283). The job was in the railroad industry, and he drove a crane and a spotter truck. (R. 78-79). It is not clear what caused him to stop working when he did; he simply said "[i]t was unbearable." (R. 92).

As is generally the case in these proceedings, the medical record is large, covering about 600 pages. (R. 388-960). And, as is also generally the case with plaintiffs claiming disability based on psychological issues like depression or anxiety, page after page of psychiatrist's notes show that plaintiff is depressed, albeit sometimes doing better or OK. Most days his affect is flat, but his concentration and focus are good and his thought process is logical and goal-directed. His judgment and insight are generally fair. Plaintiffs in these cases invariably recount issues with family, spouses, or significant others, and plaintiff here is no different. He says he has trouble with his father, with whom he is staying. Plaintiff wants his father to lend him the money to buy a house, and his father, not at all surprisingly, is unenthusiastic about that idea.

There is not much in the record to suggest whether the plaintiff is able or unable to work. Indeed, as in many instances, the record paints a picture of plaintiff that most people, working every

day, year after year, can see themselves in. Plaintiff is stressed and has financial worries. Plaintiff's brief focuses on repeated comments from his psychiatrist that plaintiff "tends to worry a lot." [Dkt. # 16, at 6-8]. If worrying a lot were the clincher for being awarded disability benefits, one would dare say that nearly every working American, even before they were all living in the midst of a pandemic and unrelenting economic, political and social upheaval, would qualify. Simply put, there must be more. While it is true that, severe depression in not the blues, *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995), it is also true that a diagnosis is not necessarily a disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). So, these are always difficult cases for an ALJ to sift through, and for a court to review.

As just noted, the medical record in this case is repetitive and not very edifying. There is evidence of some treatment for physical impairments, but medical testing invariably revealed them as "slight" or "mild." (R. 741, 744, 746, 748, 796). Not long after he applied for disability benefits, plaintiff hospitalized himself for psychological symptoms from September 5-8, 2017. (R. 599, 614). Plaintiff then began outpatient treatment with Dr. Sandhu on September 11, 2017. (R. 615). Only a week after beginning treatment, Dr. Sandhu filled out a checklist form plaintiff's counsel provided on September 18, 2017. (R. 579-83). He essentially said that plaintiff was incapable of any type of work and that he "meets or equals" – the doctor did not specify which – the two Listings, 12.04 and 12,06, plaintiff's counsel submitted. The doctor checked nearly everything on the form. For depressive disorder, 12.04, he checked: Depressed mood; Diminished interest in almost all activities; Appetite disturbance with change in weight; Sleep disturbance; Observable psychomotor agitation or retardation; Decreased energy; Feelings of guilt or worthlessness; Difficulty concentrating or thinking; and thoughts of death or suicide. (R. 579).

The doctor indicated plaintiff did not suffer from manic syndrome, but circled one of the accompanying symptoms, Easy Distractibility, anyway. (R. 579). Under the Paragraph B criteria, Dr. Sandhu circled every option: Marked restriction of activities of daily living; Marked difficulties of maintaining social functioning; Marked difficulties in maintaining concentration, persistence, or pace; Repeated episodes of decompensation, each of extended duration. (R. 580). He did the same for Paragraph C, every option: Repeated episodes of decompensation, each of extended duration; A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (R. 580).

Dr. Sandhu then addressed listing 12.06 for anxiety-related disorders in similar fashion. He circled: Motor tension; autonomic hyperactivity; apprehensive expectation; vigilance or scanning A persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid the dreaded object, activity, or situation; and recurrent severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of once a week. (R. 580-81). Dr. Sandhu opined that plaintiff met both listings and explained he came to that conclusion because plaintiff "Suffers from chronic depression, anxiety, panic disorder, learning disability, and attention deficit disorder." (R. 581). Dr. Sandhu said plaintiff would be unable to work full-time for at least 12 months." (R. 581). But, really, given the dozens of boxes Dr. Sandhu checked on the form, it was made to appear plaintiff was unable to function at all.

Dr. Sandhu then began seeing plaintiff on a regular basis. On November 21, 2017, it was reported that plaintiff: ". . . doing fair, still feeling anxious, . . . denies med side effects, sleeping poorly . . . lot of family issues, . . . is a worrier, financial stressors, increase stressors, . . . claims his father attacked him . . .has 3 kids . . . does not have stable place to stay . . . cannot function due to anxiety panic symptoms." (R. 727). Upon examination, Dr. Sandhu observed: "Alert Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited." (R. 727).

On January 2, 2018, plaintiff reported: ". . . doing fair, remain anxious/depressed, a. . . very overwhelmed . . . cannot cope with stress, cannot handle any job stress, . . . denies alc use. . . denies suicidality or intention of harming others." (R. 784). Dr. Sandhu's examination notes were: "alert, Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited." (R. 784).

On February 2, 2018, plaintiff reported: ". . . doing fairly well, anxiety/panic symptoms much better, coping much better, no med side effects, mood been steady, sleeping well . . . denies new concerns, hoping to get disability . . . denies alc abuse." (R. 780). Dr. Sandhu's examination notes were: "alert, Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 780).

On May 10, 2018, plaintiff reported: ". . . doing fair, increase anxiety symptoms, lot of family issues, financial stressors . . . is a worrier, med compliance good, increase depression . . . low

5

motivation, low energy." (R. 778). Dr. Sandhu's examination notes were: "alert, Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 778).

On June 14, 2018, plaintiff reported: "increased panic symptoms . . . difficulty leaving house . . . denies abuse of alcohol convincingly and denies any paranoia or hallucinations . . . getting along better with his family . . . denies medication side effect . . . requesting . . . paperwork for disability . . ." (R. 776). Dr. Sandhu's examination notes were: "alert, Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 776).

On July 12, 2018, plaintiff reported: "doing fair . . . anxiety/mood symptoms OK . . .coping better, no med side effects, mood been anxious, sleeping and eating well . . . has panic attacks, no med side effects . . . lives with father." (R. 775). Dr. Sandhu's examination notes were: "alert, Ox3, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited."(R. 775).

On August 27, 2018, plaintiff reported: "doing fair . . . denies alc use . . . has back pain . . . seeing sleep specialist . . . scheduled for colonoscopy . . . seeing pain specialist . . . easily overwhelmed . . . .has hearing for disability . . . afraid to leave the house due to anxiety." Dr. Sandhu observed: "alert, good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited."(R. 773).

On October 4, 2018, plaintiff reported: "doing fair . . . more depressed . . . not leaving house." Dr. Sandhu's examination observations were: "good eye contact, fine hand tremors, mood anxious, affect constricted, thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair, insight fair."(R. 771).

The therapist's notes were more dire than those of the psychiatrist, but not much more helpful in an assessment of whether plaintiff could work. On December 6, 2017, the plaintiff reported that he had a physical altercation with his father, and the police were called. The two were getting along better, however. The therapist noted flat affect, depressed mood, goal-oriented thought process, suicidal ideation but not plan, poor judgment, poor insight, intermittent alcohol abuse. GAF was 50. (R. 735-36). On January 8, 2018, plaintiff told his therapist that he was angry at his father for not lending him money to buy a house. His father had a heart attack and while plaintiff was worried, he was still angry. (R. 733). The therapist noted intermittent alcohol abuse, flat affect, depressed mood, impaired judgment, lacking insight, organized and goal-directed thought process, relevant thought content. GAF was 50. (R. 733). On January 22, 2018, the therapist noted intermittent alcohol abuse, flat affect, depressed/anxious mood, impaired judgment, lacking insight, organized and goal-directed thought process, relevant thought content. GAF was 50. (R. 732).[2]

### B.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a medical expert and a vocational expert, the ALJ determined the plaintiff had the following

---

[2] A GAF of 50 indicates more than a moderate impairment, which are indicated by a GAF score of 51-60. Am. Psychiatric Ass'n, DIAGNOSIS AND STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed. 2000). A GAF of 50 signifies "Serious symptoms(e.g. suicidal ideation, severe obsessional rituals, frequent shopliftings) OR any serious impairment in social, occupational, or school functioning(e.g. few friends, conflicts with peers or co-workers). Id.

severe impairments: depression, anxiety, obesity, spine disorder. (R. 51). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listing 1.04, plaintiff's back impairment, and Listings 12.04 and 12.06, covering plaintiff's psychological impairments. (R. 52). More specifically, the ALJ found the plaintiff's psychological impairment left him with a mild limitation in understanding, remembering, and applying information; a moderate limitation in concentrating, persisting, and maintaining pace; and a mild limitation in adapting or managing himself. (R. 52).

The ALJ then determined that plaintiff could perform light work, with a number of additional limitations making up the following byzantine, although familiar, residual functional capacity (RFC):

> except the claimant can: climb ramps or stairs frequently; can climb ladders, ropes, or scaffolds occasionally; can stoop, kneel, crouch, or crawl frequently; can work in hazardous environments such as around unprotected heights, near moving mechanical parts, or operate a motor vehicle frequently; is able to understand, carry out, remember or perform simple, routine and repetitive tasks; cannot work at a production rate pace (such as assembly line work) but would finish all end of day goals; can make simple work-related decisions and adapt only to routine work place changes; is able to occasionally interact with coworkers and supervisors; should perform no tandem tasks with coworkers and should have only superficial, non-transactional contact with the general public.

(R. 53).

The ALJ went on to summarize the medical evidence and determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. The [plaintiff] regularly reported to treating physicians that he was not feeling depressed and was

not bothered by such concerns." (R. 55). The ALJ found that the reviewing psychologist's opinions were consistent with the record with the exception of the finding that plaintiff could perform only one- or two-step tasks. The ALJ felt plaintiff's ability to drive and perform other tasks belied that restriction. (R. 55). The ALJ rejected the findings of the physician reviewers that plaintiff's back problem was not a severe impairment. (R. 56). The ALJ rejected the opinions of plaintiff's treating doctors as outdated and unsupported by the medical record. (R. 56). The ALJ also rejected the opinions of plaintiff's treating counselor as unsupported by treatment records and involving issues reserved for the Commissioner. (R. 56).

Next, the ALJ determined that the plaintiff could not perform his past work as a crane operator, as it was medium work. Then, relying on the testimony of the vocational expert, the ALJ found that, given his residual functional capacity, the plaintiff could perform other work including cleaner-housekeeping (DOT 323.687-014; 137,000 jobs in national economy), merchandise marker (DOT 209.587-034; 303,000 jobs), or assembler (DOT 729.684-054; 16,000 jobs). (R. 57). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 58).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the

9

evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997). *Accord Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

While the substantial evidence standard is a low hurdle to negotiate, *Biestek*, 139 S. Ct. at 1154, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result so as to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and "logical bridge" between the evidence and the result."). *See also Winkleman v. Saul*, 835 F.Appx. 889, 891 (7th Cir. 2021). But, at the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).

*Accord Mogg v. Baronhart*, 199 F.Appx. 572 (7th Cir. 2006).

### III.

The plaintiff contends that the ALJ committed the following reversible errors: (1) he improperly rejected the opinion of the treating psychiatrist; (2) he improperly evaluated the lay opinion of plaintiff's counselor; (3) he should have gotten additional medical expert opinions after March 2018. Any other arguments the plaintiff might have raised are deemed waived. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

### A.

Because plaintiff filed his claim after March 27, 2017, the Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, revised 82 Fed. Reg. 15132; see also 81 Fed. Reg. 62,560 (discussing proposed changes), apply. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). ALJs no longer must "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a plaintiff's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a); see also 81 Fed. Reg. 62,560, 62,574 (discussing the proposed rule changes) ("In addition to proposing to use the term 'persuasive' instead of 'weight' for medical opinions in 20 CFR 404.1520c and 416.920c, we also propose to use the term 'consider' instead of 'weigh' in 20 CFR 404.1520b and 416.920b.").

But, as before, "supportability" and "consistency" remain hallmarks of assessing medical opinions:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

>(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c), 416.920c(c). Although ALJs must consider a number of additional factors, they need only explain how they considered supportability and consistency. 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2). That's exactly what the ALJ did here. (R. 56). *See Deloney v. Saul*, 840 F.Appx. 1, 4 (7th Cir. 2020)("We will defer to an ALJ's decision to give a treating physician's opinion less than controlling weight if the ALJ considers the factors listed under § 404.1527(c) and *minimally* articulates his reasoning.")(emphasis supplied); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Elder v. Astrue*, 529 F.3d 408, 416 (7th Cir. 2008).

The ALJ rejected Dr. Sandhu's opinion that plaintiff met the listings because it was neither supported by nor consistent with the evidence in his treatment records, and the doctor provided no specifics, citations, or rationale to support his conclusions. (R. 56). All the doctor offered were conclusions. And neither here nor in any context is that enough. *See Zeigler Coal Co. v. Dir., O.W.C.P.*, 312 F.3d 332, 336 (7th Cir. 2002)("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). And here, as in every other phase of law and life, merely "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).

The doctor completed a checklist form on September 18, 2017, a week after he met plaintiff, in which he checked *nearly every symptom*! Yet, there were no findings included to support the doctor's checkmarks. He "expressed his opinion by checking boxes rather than explaining how medical evidence supported his conclusions. *Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020);

12

*Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)(checklist observations are . . . "less useful to an ALJ" than a doctor's narrative summary).

Thus, the real question in this case is whether there is any *evidence* to support Dr. Sandhu's "opinion" – an opinion, it bears repeating, that was formed based on a single encounter Dr. Sandhu had with plaintiff. The question which comes immediately to mind is how can a persuasive psychiatric opinion be based on and supported by the single encounter with the plaintiff. While plaintiff supposedly presented as depressed and anxious, Dr. Sandhu observed plaintiff's thought process to be logical and goal-directed, recent recall to be fair, insight limited, and judgment fair. (R. 593). The doctor made no mention of any of the following symptoms he had checked on his form only a week later: Diminished interest in almost all activities; Appetite disturbance with change in weight; Sleep disturbance; Observable psychomotor agitation or retardation; Decreased energy; Feelings of guilt or worthlessness; Difficulty concentrating or thinking; Easy Distractibility; Marked difficulties of maintaining social functioning; Marked difficulties in maintaining concentration, persistence, or pace; Repeated episodes of decompensation, each of extended duration; Motor tension; autonomic hyperactivity; apprehensive expectation; vigilance or scanning; A persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid the dreaded object, activity, or situation; and recurrent severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of once a week.

Just a month earlier, in August of 2017, plaintiff's previous treating psychiatrist reported that plaintiff exhibited a normal mood with no signs of depression. Thought process was normal.

13

Cognitive functioning was normal. Concentration was normal. Short and long term memory were intact, There was no sign of any attention deficit. (R. 576). That report certainly contradicts the debilitating findings Dr. Sandhu checked off on his list as well.

In some respects, Dr. Sandhu's "opinion" does not even make sense internally, and thus could properly be discounted. *See Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019)(discounting internally inconsistent checklist opinion). And "'an internally inconsistent opinion by an ALJ is likely to fail to build a logical bridge between the evidence and the result.'" *Lothridge v. Saul*, 984 F.3d 1287, 1233 (7th Cir. 2021). It bears repeating that at the time, the doctor had seen plaintiff only once, and the question which arises as to any fair evaluation of the doctor's conclusions are how could he observe *persistent* fears or *recurrent* panic attacks or *weekly* onsets of apprehension? A doctor who has seen a patient only once cannot recount *repeated* episodes of decompensation. At best, at the one meeting, he could only take at face value allegations of the patient regarding what the patient says occurred previously. One supposes that a doctor can simply take a patient's word for historical events, but to do so exclusively, detracts from the persuasive value of a medical opinion as well. *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)(ALJ properly rejected opinion from psychologist as it "largely reflected [plaintiff's] subjective reporting."); *Britt v. Berryhill*, 889 F.3d 422, 426–27 (7th Cir. 2018). But even that does not explain Dr. Sandhu's opinion, because in his single session with plaintiff, he recorded no such subjective complaints from the plaintiff.

Given the chasm between the medical record, either at the time Dr. Sandhu offered his opinion checklist or thereafter, the ALJ really had no legitimate and principled choice but to find the doctor's opinion was neither supported by the medical evidence nor consistent with it. *See, e.g.,*

*Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *Burmester,* 920 F.3d at 512; *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). And, contrary to the plaintiff's Brief, the record of treatment thereafter does not support Dr. Sandhu's opinion that plaintiff is disabled either. As already noted, plaintiff cites several occasions where Dr. Sandhu reported that plaintiff worried a lot. But even if true, that condition is not an uncommon one and, even if true, is not evidence of "disability." And it certainly does not support Dr. Sandhu's checklist – nor do any of the doctor's treatment notes over the course of several months of treatment:

> November 21, 2017: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited." (R. 727).
>
> January 2, 2018: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited." (R. 784).
>
> February 2, 2018: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 780).
>
> May 10, 2018: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 778).
>
> June 14, 2018: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight fair."(R. 776).
>
> July 12, 2018: "thought process logical, convincingly denies suicidality or homicidality, no psychosis, focus concentration good, judgement fair and insight limited."(R. 775).

There is no mention by the doctor of the plaintiff having any of the following: difficulty concentrating or thinking; easy distractibility; marked difficulties of maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of

15

decompensation, each of extended duration! Those omissions are significant if not critical.³ What makes good concentration and focus disabling? There is no explanation from Dr. Sandhu, and there is no explanation from plaintiff. The ALJ's rejection of the opinion was entirely appropriate. *See Pavlicek v. Saul*, – F.3d –, –, 2021 WL 1291614, at *3 (7th Cir. 2021)(ALJ properly discounted psychiatrist's opinion where notes revealed normal thought process, intact concentration, no memory deficits); *Schmidt v. Astrue*, 496 F.3d 833, 842–43 (7th Cir. 2007)(ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes).

**B.**

Then there is the opinion from the plaintiff's counselor, Mr. Hurley, who saw plaintiff on four occasions in the winter of 2017-18. As already noted, he assigned plaintiff a GAF score of 50 in December 2017 and January 2018. Plaintiff thinks the ALJ gave short shrift to Mr. Hurley's assessment, mentioning it only in passing. But a licensed and certified counselor such as Mr. Hurley is not an acceptable medical source. See 20 C.F.R. § 404.1502(a). Again, the regulations have been updated. 20 C.F.R. § 404.1520c(d) provides that the agency is not required to articulate how it considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section. 20 C.F.R. § 404.1520c(d)("We are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section."); *Wright v. Comm'r of Soc. Sec.*, 2020 WL 5651540, at *6 (S.D. Ohio 2020); *Kaufman V.*

---

³ If the plaintiff was experiencing any of the above, one may fairly assume he would have mentioned something to the doctor. In testing the significance of omissions in various contexts, the underlying test would it have been natural for the person to make the assertion in question. 3A Wigmore, Evidence in Trials at Common Law, § 1042 at 1058 (Chadbourn Rev. 1970).

*Commissioner of Social Security*, 2020 WL 7701020, at *11 (E.D. Mich. 2020). So, the ALJ committed no error in this respect.

Moreover, GAF scores "do[ ] not reflect the clinician's opinion of functional capacity" because they measure and reflect the worse of the severity of symptoms and functional level. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The American Psychiatric Association has also abandoned the GAF scale because of its "conceptual lack of clarity ... and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

Finally, the plaintiff complains that the last state agency review of the medical record was in March 2018, and found that plaintiff did not suffer from any severe physical impairment. Plaintiff goes on to cite a handful of medical records dealing with plaintiff's physical impairments. These records show "slight" liver impairment "suggestive of fatty infiltration" (R. 741), "mild" arthritic changes in plaintiff's cervical spine (R. 748), a "small" disc protrusion in plaintiff's thoracic spine (R. 746), a "mild" bulge in plaintiff's lumbar spine (R. 744), and a diagnosis of "mild" sleep apnea. (R. 796). Plaintiff does not claim that he experiences any physical limitations due to these minimal impairments, other than drowsiness from sleep apnea. (R. 329-39). Nevertheless, he argues that these mild or slight findings "changed the picture so much that medical and mental expert reviews were necessary to determine the limitations arising from that evidence." [Dkt. #16, at 14]. That seems an obvious exaggeration given the results of those tests. But, when one considers the case plaintiff cites to support his claim, things really fall apart. In *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), the evidence that came in after medical review showed not only degenerative changes and stenosis in the plaintiff's spine, but brain tissue extending into the spinal canal. That is

17

obviously "potentially decisive medical evidence," as the court described it, while the minimal findings plaintiff attempts to liken to it here are clearly not. Moreover, the ALJ did not ignore them as the ALJ did in *Goins*. Instead, he discussed them (R. 54-55), rejected the medical review findings that plaintiff had no severe physical impairment (R. 56), and found those impairments limited plaintiff to light work. (R. 51). So, contrary to plaintiff's mischaracterization of the ALJ's Opinion, the ALJ did not rely on outdated medical opinions, as the ALJ did in *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying the plaintiff Social Security Disability Insurance Benefits and Supplemental Security income is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/20/21